UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )
                                )
    vs.                         ) Case No. 1:12CR120SNLJ (SPM)
                                )
DAVID S. GENTLES,               )
                                )
        Defendant.              )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

In accordance with the Memorandum filed herein,

**IT IS HEREBY RECOMMENDED** that Defendant's Supplemental Motion to Suppress Evidence [Doc. No. 102] be **DENIED.**

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Trial in this case has been set on **March 11 and 12, 2015,** at **9:00 A.M.** before the Honorable Stephen N. Limbaugh, Jr.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of January, 2015.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:12CR120SNLJ (SPM) |
| | ) |
| DAVID S. GENTLES, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM**

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and is currently before the court on Defendant David Lee Gentles' Supplemental Motion to Suppress Evidence. (Doc. No. 102).

**BACKGROUND AND PROCEDURAL HISTORY**

On May 17, 2012, members of the Poplar Bluff Police Department searched Defendant's residence and seized evidence pursuant to a search warrant issued by the Circuit Court of Wayne County, Missouri. The search warrant was issued based on information provided to local police by Naval Criminal Investigative Services ("NCIS") Special Agent Stephen Logan. The information provided by Agent Logan indicated that in March 2012, Agent Logan was logged onto Yahoo! Messenger posing as a 12-year-old girl when he chatted with a subject using the screen name "hellosweetdarlin." The subject, later identified as Defendant David Gentles, masturbated on Webcam for the undercover agent and provided the undercover agent a tutorial on how to masturbate. The subject also

sent pictures of a girl he identified as his 14 year old daughter and stated he taught her to masturbate.

On November 15, 2012, Defendant was charged in an indictment with one count of attempting to transfer obscene matter to a minor in violation of 18 U.S.C. § 1470. (Doc. No. 2). The United States filed a superseding indictment on May 7, 2014, which alleged essentially the same charges (Doc. No. 85). On October 7, 2013, Defendant filed a Motion to Suppress evidence challenging the May 17th search of his residence. (Doc. No. 57). Following a hearing and briefing on the motion, the Honorable Lewis M. Blanton issued a Report and Recommendation recommending that the motion be denied. That recommendation was ultimately adopted by the United States District Court in an order denying Defendant's motion to suppress evidence. (Doc. No. 82).

Defendant filed a Supplemental Motion to Suppress Evidence contending that the Ninth Circuit Court of Appeals' September 2014 decision in *United States v. Michael Allan Dreyer,*767 F.3d 826 (9th Cir. 2014), provided a new ground for suppression in this case. (Doc. No. 102). In *Dreyer,* the Ninth Circuit held that an NCIS agent's investigation for online criminal activity by anyone in the state of Washington, whether connected to the military or not, constituted improper military enforcement of civilian laws. *Id*. at 835. The Ninth Circuit further held that application of the exclusionary rule was justified to deter similar future conduct by NCIS. *Id*. at 836-37. Agent Stephen Logan, the NCIS agent in this case, is the same NCIS agent whose conduct was at issue in *Dreyer.* Defendant contends that this Court should follow *Dreyer* and hold that Agent Logan's involvement in

the investigation here violated the Posse Comitatus Act, 18 U.S.C. § 1385 (the "PCA"), and related regulations. Defendant further contends that because the search of his residence was predicated almost exclusively on Agent Logan's investigation, and because that investigation violated the PCA, the Court should exclude the fruits of Agent Logan's investigation.

I held an evidentiary hearing on October 16, 2014, at which Agent Logan was the sole witness. At the request of the United States (and with consent of the Defendant), I incorporated into the supplemental hearing all of the testimony and exhibits that were previously presented to Judge Blanton at the evidentiary hearing on Defendant's initial motion to suppress. Following the hearing, the parties requested time to submit post-hearing briefs. The matter has been fully briefed and is now ready for ruling.

After considering the evidence adduced at the hearing on the supplemental motion to suppress and the briefs of the parties, I find that although there are similarities between this case and *Dreyer,* the distinctions are significant. As a result of those significant distinctions, which are set out below, the facts of this case do not warrant application of the exclusionary rule even assuming the PCA applies to Agent Logan and assuming Agent Logan's conduct in this case violated the PCA. As such, I recommend that Defendant's Supplemental Motion to Suppress be denied.

## FACTUAL FINDINGS

Stephen Logan is a special agent with the Naval Criminal Investigative Service ("NCIS") who is stationed in Virginia Beach, Virginia. NCIS is a law enforcement agency

whose core mission is to investigate and defeat criminal terrorists and foreign intelligence threats to the Navy and Marine Corps ashore, afloat, and in cyberspace. (S. Tr. 49).[1] As an NCIS Special Agent, Agent Logan is employed as a civilian employee of the Department of Defense, Department of the Navy. (S. Tr. 48). Although Agent Logan's primary job is to enforce the Uniform Code of Military Justice ("UCMJ") and federal law as it pertains to military personnel, Agent Logan believes that he is authorized, at least to some extent, to conduct investigations that are not aimed at military personnel. (S. Tr. 49-50 & 88-90). At the time of the hearing, Agent Logan's primary responsibility for NCIS was to conduct criminal investigations into child sex crimes, domestic violence, and adult sex crimes, all of which are criminal offenses under both the code of military justice and the United States Code. (S. Tr. 15 & 18-19).

On March 21, 2012, Agent Logan was participating in a training class in Savannah, Georgia sponsored by the Internet Crimes Against Children (ICAC) Task Force. The ICAC program is an initiative under the auspices of the Department of Justice that investigates child exploitation via the internet, and related issues. (S. Tr. 20). According to an Interim Report to the Attorney General for Fiscal Years 2010 and 2011, from the U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention, "The ICAC program is a national network of 61 coordinated task forces representing more than 3,000 federal, state, local, and tribal law enforcement

---

[1] All references to the transcript from the October 16, 2014, hearing on Defendant's Supplemental Motion to Suppress Evidence will be designated as follows: "S. Tr. ___." References to the transcript from the ___, 2014 hearing on Defendant's initial Motion to Suppress Evidence will be designated as "Tr. __."

prosecutorial agencies. These agencies engage in investigations, forensic examinations, and prosecutions related to technology-facilitated sexual exploitation of children and Internet crimes against children." Review of the Internet Crimes Against Children Task Force Program, *available at* http://www.ojjdp.gov/pubs/240146.pdf. Among other things, the task forces provide "educational information to parents, educators, prosecutors, law enforcement, and others concerned with child victimization." *Id.*

The purpose of the program Agent Logan attended on March 21, 2012, was to instruct law enforcement officers in conducting undercover internet investigations of child sexual exploitation and internet crimes against children. (S. Tr. 13, 14, 21-23). The class, which was sponsored by and taught by instructors for ICAC, was made up of local, state and federal law enforcement officers. Of the 20-30 participants, Agent Logan and another agent were the only two students who were Department of Defense employees. (S. Tr. 23).

During the class, Agent Logan logged on to Yahoo Messenger posing as a 12-year-old girl living in Lexington, Kentucky with the screen name "SunnySara12". (S. Tr. 25-26). Using the screen name "hellosweetdarlin," Defendant initiated a "chat" with Agent Logan. (S. Tr. 27-29). Defendant identified himself as living in Missouri and as the father of a 14-year-old daughter named Donna. (S. Tr. 29-30). Gentles sent Agent Logan two photographs of a female child and the name of the high school she attended, referring to it as "Clearwater." (S. Tr. 29-32). During the chat, "hellosweetdarlin" (Gentles) instructed "SunnySara12" on how to masturbate; "hellosweetdarlin" also stated that he had taught his 14-year-old daughter to masturbate. (S. Tr. 32). During the chat, Defendant

("hellosweetdarlin") sent a video image of himself masturbating to Agent Logan. (S. Tr. 33).

Agent Logan became concerned that a child might be in danger once "hellosweetdarlin" indicated that he had a 14-year-old daughter and that he had given his daughter the same instructions on how to masturbate that he was providing to Agent Logan. (S. Tr. 55). So, Agent Logan contacted one of the ICAC instructors. Agent Logan saved the chat session with Gentles, including the previously described live web cam transmission; and, at the instruction of the ICAC instructor, he forwarded the information to law enforcement officers in Missouri. According to Agent Logan, "[t]he ICAC instructor said based on the contents of your chat you should absolutely forward this information on to local law enforcement, because there's potential for a child to be endangered." (S. Tr. 79). The ICAC instructor told Agent Logan to send the information regarding Gentles' chat and obscene images to state and local authorities to investigate further. (S. Tr. 79-81). Agent Logan testified that because he was a student participating in a training class at the time of this interaction, if the ICAC instructor had told him not to report Gentles' conduct to law enforcement authorities in Missouri, he would not have done so. (S. Tr. 80-81). He said "I would have followed their advice. They were the experts. I was the student." (S. Tr. 80). The ICAC instructor gave Agent Logan the name of the Missouri ICAC point of contact, Lieutenant Mateja. (S. Tr. 83). At the time of the suppression hearing on October 16, 2014, this was the only undercover chat investigation in which Agent Logan had participated. (S. Tr. 76).

Using software and a website available to the general public, Agent Logan determined that the Internet Protocol (IP) address being used by "hellosweetdarlin" was 173.186.193.43. (S. Tr. 34). An Internet Protocol address is a unique number that is assigned to an Internet connection, similar to a telephone number. (S. Tr. 34). Agent Logan used a publicly available website to determine that the Internet Service Provider (ISP) for IP address 173.186.193.43 was Windstream Communications, Inc. (Windstream). (S. Tr. 35-36). Agent Logan submitted a request to the NCIS representative at the National Center for Missing and Exploited Children (NCMEC) for an administrative subpoena to be issued to Windstream for subscriber information for the account using IP address 173.186.193.43 on March 21, 2012. (Gov't. Ex. 4A). That request was submitted to the Federal Bureau of Investigation (FBI), which sent an administrative subpoena to Windstream in Little Rock, Arkansas, requesting subscriber information for IP address 173.186.193.43 for March 21, 2012, at 15:06:39 EDT. (Gov't. Ex. 4; S. Tr. 37-38).

Windstream responded to the FBI's subpoena request on May 8, 2012. (Gov't. Ex. 5). The information provided by Windstream indicated, among other things, that the User ID and Username for IP Address 173.186.193.43 at the requested time was fcgc01, in the name of David Gentles, Billing Address PO Box 38, Mill Springs, Missouri 63952, at the address of Rt 3, Box 7292, Hwy 495 in Looper, Missouri 63957. (Gov't. Ex. 5; S. Tr. 38). After confirming that David Gentles was not a member of the military, Agent Logan contacted Lieutenant Chris Mateja of the St. Charles County, Missouri, Sheriff's Department, who serves as the point of contact for the Missouri ICAC Task Force. (S.Tr.

40-41). Agent Logan sent Lieutenant Mateja a compact diskette containing video images

of the chat conversation Gentles had with Agent Logan on March 21, 2012, including a

copy of the video recording of Gentles masturbating over the web camera during his chat

with Agent Logan. (S. Tr. 41). Lieutenant Mateja then sent a referral to Lieutenant David

Sutton of the Poplar Bluff Police Department along with a copy of the compact diskette,

requesting that Lieutenant Sutton investigate the matter. (Gov't. Ex. 1; S. Tr. 43).

Lieutenant Sutton's subsequent investigation led to the charges in this case.

The sole witness to testify on behalf of the Government at the evidentiary hearing on

Defendant's original motion to suppress evidence was Detective David Sutton. Detective

Sutton testified that he prepared the search warrant for Defendant's residence using a

"template." Detective Sutton testified that, except for the physical address of Defendant,

all of the facts he relied upon to obtain the search warrant was information generated by

NCIS Agent Logan working in his undercover capacity. (Tr. 47-48). Detective Sutton

confirmed that all of the exhibits submitted by the Government at the original hearing were

obtained or created at the behest of Agent Logan. (Tr. 44, 47 & 52; S. Tr. 72).

## CONCLUSIONS OF LAW

Defendant argues that the facts of this case are sufficiently similar to those in *Dreyer*

to warrant application of the reasoning and holding of *Dreyer* to this case. In *Dreyer,*

Agent Logan was investigating the distribution of child pornography online from his office

in Georgia. *Dreyer,* 767 F.3d at 827. He used a software program, RoundUp, to search for

any computers located in the state of Washington sharing known child pornography on the

Gnutella file-sharing network. *Id.* at 827. Agent Logan identified Dreyer's computer as one that was sharing several files identified by RoundUp as child pornography. Agent Logan downloaded and viewed several of the files and concluded they were child pornography. *Id.* at 828. He then took steps virtually identical to the steps he took in this case. Specifically, he requested an administrative subpoena for the name and address associated with the IP address through NCIS's representative at the National Center for Missing and Exploited Children, which turned the request over to the FBI. *Id.* The FBI sent an administrative subpoena to Comcast, which responded by providing Dreyer's name and address in Algona, Washington. *Id.*

After receiving the requested information, Agent Logan checked the Department of Defense ("DOD") database to determine if Dreyer had any military affiliation. *Id.* Once he determined Dreyer had no military affiliation, Agent Logan wrote a report summarizing his investigation and forwarded it, together with the supporting material, to the NCIS office in the state of Washington which, in turn, turned the information to the local police in Algona, Washington. *Id.* The Algona police ultimately obtained a search warrant of Dreyer's residence that relied almost exclusively on the information provided by Agent Logan. *Id.* The evidence seized led to Dreyer's charges and ultimate conviction for distribution and possession of child pornography. *Id.* at 828-29.

On appeal, Dreyer argued that Agent Logan had no lawful authority to investigate civilian crimes and that, as a result, the district court erred in denying his motion to suppress evidence. *Id.* at 829. The Ninth Circuit agreed with Dreyer and reversed the

conviction and the district court's ruling on Dreyer's suppression motion. In so holding, the Ninth Circuit concluded, first, that as an NCIS agent, Agent Logan's activities constituted "military" actions subject to the Posse Comitatus Act ("PCA"). *Id.* at 830-32.

Next, the Ninth Circuit held that Agent Logan's investigation violated the PCA. Id. at 832-35. Central to the court's holding was its conclusion that Agent Logan's use of RoundUp to surveil all computers in the state of Washington "amounted to impermissible direct active involvement in civilian enforcement of child pornography laws, not permissible indirect assistance." *Dreyer,* 767 F.3d at 832. The court reasoned, "Agent Logan engaged in his investigation not in any support capacity to civilian law enforcement, but rather as an independent actor who initiated and carried out this activity." *Id.* at 833. The Ninth Circuit rejected the government's argument that Agent Logan's investigation served an independent military purpose because the Uniform Code of Military Justice also prohibits distribution of child pornography by a member of the armed forces. *Id.* Noting that Agent Logan "surveyed the entire state of Washington for computers sharing child pornography," the court concluded, "Agent Logan's search was not reasonably focused on carrying out such a legitimate military investigation." *Id.*

Finally, the Ninth Circuit held that the facts of *Dreyer* demonstrated that application of an exclusionary rule was necessary to deter future violations. *Id.* at 835-36. The court's decision to apply the exclusionary rule in *Dreyer* turned largely on its concern that, based on the record before it, it appeared that "it has become a routine practice for the Navy to conduct surveillance of all the civilian computers in an entire state to see whether any

child pornography can be found on them, and then to turn over the information to civilian law enforcement when no military connection exists." *Id.* at 836. The court acknowledged its own precedent that "[t]here must be an exceptional reason to invoke the exclusionary rule for violation of posse comitatus-like regulations," but concluded that "the broad use of military surveillance of overwhelmingly civilian populations is an exceptional reason." *Dreyer,* 767 F.3d at 836 (internal quotation marks omitted).

The Government contends that this court should not adopt either the reasoning or holding of *Dreyer* because, among other reasons, the PCA does not apply to Agent Logan's activities in this case and, even if it did, the facts of this case do not warrant application of the exclusionary rule. I agree.

## A. The Posse Comitatus Act Does Not Apply.

By its terms, the PCA prohibits Army and Air Force military personnel from participating in civilian law enforcement activities except when expressly authorized to do so by the Constitution or Act of Congress:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1385.

Although the PCA does not expressly apply to the Navy, in 1981, Congress passed a separate non-penal statute directing the Secretary of Defense to "prescribe such regulations as may be necessary to ensure that any activity" under Title 10 "does not include or permit

direct participation by a member of the Army, Navy, Air Force or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law. 10 U.S.C. § 375. The Department of Defense made the PCA applicable to the Navy and the Marine Corps as a matter of policy. *See* Gov't. Ex. 13, Add. pp. 14-23 (Department of Defense Directive 5525.5 (January 15, 1986)). The Secretary of the Navy adopted this policy as well. *See* Gov't. Ex. 13, Add. p. 69 (SECNAVINST 5820.7C, ¶ 8(a) (26 January 2006)). However, policy instructions issued by the Department of Defense and Department of the Navy include an exemption based on "status," which provides that civilian employees of the Department of Defense are exempt from PCA-like restrictions unless "the civilian employee is under the direct command and control of a military officer." *See* Gov't. Ex. 13, Add. pp. 20 & 76.

In *Dreyer*, the Government apparently relied on the status exemptions contained in DOD and Naval policy instructions and regulations when it argued, as it does in this case, that because NCIS agents are mostly civilians and NCIS is headed by a civilian director with a civilian chain of command, the PCA and similar restrictions do not apply to NCIS. *Dreyer,* 767 F.3d at 830. Citing its earlier decision in *United States v. Chon*, 210 F.3d 990, 993 (9th Cir. 2000), the Ninth Circuit rejected that argument. In so doing, the Ninth Circuit reasoned that "'the PCA and PCA-like restrictions function to proscribe use of the strength and authority of the military rather than use of the private force of the individuals who make up the institution.'" *Dreyer,* 767 F.3d at 831 (quoting *Chon,* 210 F.3d at 993-94). Citing language contained in recent DOD regulations and policy instructions, the *Dreyer*

court rejected as "unsound" the government's assertion that "there is a meaningful difference between civilian and other employees of the Navy for the purposes of PCA-like restrictions." *Id.* More specifically, the court held that DOD regulations and policy instructions clearly state that they "'apply to civilian employees of the DOD Components,' and that their restrictions on direct participation in civilian law enforcement 'apply to all actions of DOD personnel worldwide,' with 'DOD personnel' defined to include 'Federal military officers and enlisted personnel and civilian employees of the Department of Defense.'" *Id.* at 831-32 (quoting 32 C.F.R. §§ 182.2(e), 182.3, 182.4(c); DODI 3025.21(2)(e), 4(c), Glossary Part II . The Ninth Circuit concluded that in light of this clear language, the status exemptions in DOD and Naval policy instructions and regulations should not be construed as exempting all civilian employees of DOD from PCA-like restrictions. *Id*. Instead, the Ninth Circuit held the status exemptions should be interpreted as permitting DOD personnel to "participate in civilian law enforcement activities in their private capacities" but prohibiting them from participating in civilian law enforcement activities "under the auspices of the military." *Id.* at 831.

Assuming, without deciding, that the Ninth Circuit's reasoning and conclusions in *Dreyer* are correct and the PCA applies, generally, to civilian employees of NCIS, the PCA does not apply under the facts presented here because at the time he investigated Defendant Gentles, Agent Logan was not acting under the auspices of the military. As the foregoing factual findings demonstrate, in stark contrast to the facts of *Dreyer,* when Agent Logan first encountered the Defendant on March 21, 2012, he was not engaged in

any independent military or NCIS investigation. He was participating in a training class sponsored by ICAC. While in that training program, Agent Logan witnessed a crime — namely, Defendant sending obscene images over the Internet. Agent Logan was not conducting a broad search of computers used by unsuspecting civilians; he was logged onto Yahoo! Messenger, a widely used instant messaging service, when he was approached online by the Defendant. Based on Defendant's representations to Agent Logan, Agent Logan believed that a 14-year-old female, purportedly Defendant's daughter, was at risk for sexual abuse in Defendant's home. Agent Logan alerted the instructors of the training class about his concern and they directed him to turn over the information to local law enforcement. Although, as Agent Logan testified, the training was intended to provide him with skills he needed to carry out his job with NCIS, at no point during his encounter with the Defendant was Agent Logan acting under the command or direction of any military personnel. Nor was Agent Logan acting under the command or direction of any military personnel when he related what he witnessed to local law enforcement. Rather, Agent Logan assumed an undercover identity and later reported what he witnessed to local law enforcement, all under the direction of the non-military ICAC training instructors.

In applying the reasoning from *Dreyer,* Agent Logan's conduct admittedly does not fall neatly within the exemption permitting DOD personnel to "participate in civilian law enforcement activities in their private capacities" because Agent Logan was attending the training program in connection with his job as an NCIS Special Agent. However, Agent

Logan's interactions with Defendant and subsequent interactions with local law enforcement all occurred under the auspices of ICAC; they did not occur under the auspices of the military or NCIS. In this respect, Agent Logan's activities in this case are much more akin to the permitted activities of a civilian employee of the DOD participating in civilian law enforcement activities in his private capacity. The PCA does not apply in the instant case because Agent Logan's conduct in this case cannot properly be characterized as the use of the strength and authority of the military to participate in civilian law enforcement activities.

### B. APPLICATION OF THE EXCLUSIONARY RULE IS NOT WARRANTED.

Even if the PCA applied to Agent Logan's investigation in this case and the investigation constituted a PCA violation,[2] the facts presented here do not warrant application of an exclusionary rule. In *Dreyer,* the Ninth Circuit recognized that "there must be an exceptional reason to invoke the exclusionary rule for violation of posse comitatus-like regulations." 767 F.3d at 836. Although this case involves the same NCIS agent involved in *Dreyer*, it does not present the same "exceptional reasons" that formed the basis of the Ninth Circuit's decision to suppress evidence flowing from Agent Logan's actions. Unlike the situation in *Dreyer,* this case does not involve an independent NCIS investigation by Agent Logan. Nor does this case involve any broad-based surveillance by

---

[2] The Government also argues that even if the PCA applied to Agent Logan's investigation, his conduct did not violate the PCA. Specifically, the Government contends that, at best, Agent Logan's investigation constituted indirect assistance to civilian law enforcement which is permitted under the PCA. This argument has some force given the facts set out above. However, the Court need not resolve this issue in light of the finding below that the relief sought by Defendant—suppression— is not available under the facts of this case.

Agent Logan of an overwhelmingly civilian population. To be sure, Agent Logan went online under an assumed name and was certainly engaging in activities that could be used for undercover online surveillance. However, all of his activity was done in connection with a training program under the auspices of ICAC.

In applying the exclusionary rule in *Dreyer*, the conduct the Ninth Circuit sought to deter was routine surveillance by the Navy of all civilian computers in an entire state to see whether any child pornography can be found on them. *See Dreyer,* 767 F.3d at 836. Here, a civilian Naval employee stumbled on criminal activity while attending a non-military training program and shared his findings with local law enforcement, at the direction of the program's instructors. Notwithstanding Agent Logan's hearing testimony that he believes he has authority to investigate crimes unrelated to the military, the fact is that in this instance Agent Logan was not carrying out his own independent investigation when he encountered the Defendant. Indeed, he was not conducting any investigation at all. He was in a training class. As such, application of the exclusionary rule under the facts here would not address the concerns articulated by the court in *Dreyer.* Instead, application of the exclusionary rule under the facts here may serve to deter local police from accepting, and military law enforcement agencies from providing, information those agencies obtain about civilian criminal activity.

Although the Eighth Circuit has not addressed the issue, other than *Dreyer,* no other federal circuit court of appeals confronted with the issue of whether to apply the exclusionary rule to an alleged PCA violation has opted to suppress evidence. *See United*

*States v. Johnson*, 410 F.3d 137, 149 (4th Cir. 2005) ("[D]espite the important function of the Act in 'upholding the American tradition of restricting military intrusions into civilian affairs,' '[a]s a general matter, the exclusionary rule is not a remedy for violations of the [Act].'") (quoting *United States v. Al-Talib*, 55 F.3d 923, 930 (4th Cir. 1995)); *Hayes v. Hawes*, 921 F.2d 100, 104 (7th Cir. 1990); *United States v. Griley*, 814 F.2d 967, 976 (4th Cir. 1987); *United States v. Wolffs*, 594 F.2d 77, 85 (5th Cir. 1979); *United States v. Walden*, 490 F.2d 372, 377 (4th Cir. 1974). *See also United States v. Vick*, 842 F. Supp. 2d 891, 894 (E.D. Va. 2012) (holding it unnecessary to decide whether an NCIS agent's involvement in an investigation into marriage fraud committed by civilians violated the PCA, because the defendants were not entitled to the relief sought— namely, dismissal of the indictment and application of the exclusionary rule).

In *Dreyer*, the Ninth Circuit recognized that by applying the exclusionary rule to a PCA violation, it was departing from its own precedent as well as decisions in other circuits. *See Dreyer,* 767 F.3d at 835-36 (discussing its decision in *United States v. Roberts,* 779 F.2d 565, 568 (9th Cir. 1986), and cases from other circuits). Indeed, writing in a concurring opinion, Judge Kleinfeld acknowledged, "We have not found another case in this circuit or our sister circuits applying the exclusionary rule to Posse Comitatus violations." *Id.* at 838 (Kleinfeld J. concurring). However, consistent with the majority's holding, Judge Kleinfeld concluded that notwithstanding the absence of federal precedent,

application of the exclusionary rule was justified in *Dreyer* because the court had not found "another case in which the violations were so massive." *Id.*[3]

Although the Eighth Circuit has not directly confronted the issue of whether to apply the exclusionary rule to PCA-like violations, it has repeatedly held that the exclusionary rule is typically available only for violations of constitutional magnitude, not for statutory or treaty violations. *See, e.g., Downs v. Holder*, 758 F.3d 994, 998 (8th Cir. 2014) (holding that "in criminal cases, the primary justification for the exclusionary rule is the deterrence of police conduct that violates Fourth Amendment rights" and refusing to apply the exclusionary rule to an alleged violation of the Federal Educational Rights and Privacy Act (FERPA) in a civil removal hearing) (internal quotation marks omitted); *United States v. Hornbeck,* 118 F.3d 615, 618 (8th Cir. 1997) (cautioning courts in criminal cases to be wary of extending the exclusionary rule to violations not of constitutional magnitude and refusing to apply the rule where defendant's sole basis for suppression was that evidence was seized from his home in violation of tribal law and the alleged violation was "not of constitutional magnitude").

Eighth Circuit cases further instruct that "exclusion of evidence is 'a judicially created rule designed to safeguard Fourth Amendment rights generally through its deterrent effect'"; however, exclusion should be a "last resort, not [a] first impulse." *United States v. Hamilton,* 591 F.3d 1017, 1027-28 (8th Cir. 2010) (quoting *Herring v.*

---

[3] As the Government noted in its post-hearing brief, on December 16, 2014, the Ninth Circuit on its own motion, instructed the parties to file simultaneous briefs on whether the case should be heard *en banc*. As such, *Dreyer* may be reconsidered by the full Ninth Circuit.

*United States,* 555 U.S. 135, 140 (2009)) (internal quotations omitted). Under this circuit's precedent, "the exclusionary rule applies only where 'its remedial objectives are thought most efficaciously served,'" and the court must "balance[] the benefits of deterrence against the costs of excluding the evidence, particularly the social costs of 'letting guilty and possibly dangerous defendants go free.'" *Id.* at 1028 (quoting *Arizona v. Evans,* 514 U.S. 1, 10 (1995) and *Herring,* 555 U.S. at 138) (internal quotations omitted).

In applying the foregoing principles to the facts presented in this case, I find that application of the exclusionary rule is neither necessary nor appropriate. As discussed above, this case involves an alleged violation of PCA-like restrictions— the applicability of which are questionable given the circumstances. In addition, for the reasons previously set forth above, the facts here do not present the "exceptional circumstances" articulated in *Dreyer.* In sum, when all of the facts of this case are considered, even assuming the PCA-like restrictions applied to Agent Logan's investigation of Gentles and even assuming Agent Logan's conduct in this case constituted a violation of the PCA-like restrictions, any benefit of deterrence gained by application of the exclusionary rule is far outweighed by the costs of excluding the evidence.

## **CONCLUSION**

For all of the foregoing reasons, Defendant's Supplemental Motion to Suppress

Evidence (Doc. No. 102) should be denied.


Dated this 22nd[t] day of January, 2015.

<u>/s/ *Shirley Padmore Mensah*</u>
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE